## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Kevin Bores, Jennifer Huber, Christopher McCormick, Blue Earth Enterprises, Inc., Mid America Pizza, LLC, Rising Dough, Inc., RJ Inc., Galleons Inc., J Triple T, Inc., FBN, Inc., Try Our Pizza Inc., and M&M Pizza, | Case Number:  05-CV-2498 RHK/JSM |
| Plaintiffs, | **MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR A PROTECTIVE ORDER** |
| v. | |
| Domino's Pizza, LLC, | |
| Defendant. | |

### INTRODUCTION

This motion arises in what should be a relatively uncomplicated case involving the determination of the parties' rights and obligations under written contracts.  Plaintiffs, however, have attempted to derail and prolong this case by turning the focus onto disputes over their most unusual requests for discovery.  As explained in previous motions and hearings before this Court, Plaintiffs have continuously engaged in obstructive and vexatious conduct throughout discovery.  By this motion, defendant Domino's Pizza, LLC seeks to expedite the case, keep discovery in the action on track, and return the focus to the central issue: the contractual rights and obligations of the parties.

## FACTUAL BACKGROUND

**A.     Narrow Scope of the Case.**

The central issue in this case concerns the rights and obligations of the parties

under various franchise agreements.  Plaintiffs and counterdefendants, Kevin Bores,

Jennifer Huber, Christopher McCormick, and various companies they own (collectively

"Plaintiffs") operate *Domino's Pizza* stores pursuant to various written franchise

agreements with Defendant Domino's Pizza, LLC ("Domino's").  (Answer and

Countercls. of Domino's at 4, Attachment A to Wittrock Aff.) [1]  Under the franchise

agreements, Plaintiffs agreed to "fully comply with all specifications, standards and

operating procedures and rules" for the operation of *Domino's Pizza* stores.  (*Id.* at 4, 5.)

More specifically, section 14.1 of the Standard Franchise Agreement provides in relevant

part as follows:  "You agree to establish and retain a bookkeeping, recordkeeping,

computer and point of sale system (including a record of the names, addresses, telephone

numbers and order history of the customers in your Store's delivery area) conforming to

the requirements prescribed by us…"  (*Id.* at 5.)  Domino's has advised all *Domino's*

*Pizza* franchisees, including Plaintiffs, that a new computerized point-of-sale system

called Domino's PULSE would be required in all stores by June 2008, and Domino's has

installed the system in over 500 company-owned stores.  (*Id.* at 6.)  Plaintiffs, however,

have challenged their legal obligations under the franchise agreements to install and use

the Domino's PULSE system.  (*Id.*)  The narrow issue before the Court, therefore, is

---

[1]     All Attachments referenced herein are attached to the Affidavit of Quentin R.
Wittrock in Support of Defendant's Motion for a Protective Order, filed
contemporaneously herewith.

whether Domino's has the contractual right to require franchisees to install the Domino's

PULSE computer system.  It is in this context that the Court should evaluate this motion.

**B.**     **Domino's Compliance with Fed. R. Civ. P. 26.**

The Court filed the Pretrial Scheduling Order in this case on December 21, 2005,

following the parties' preparation of a Rule 26(f) Report and the initial meeting among all

counsel and the Court.  In the Pretrial Scheduling Order, the Court allowed each side to

serve 50 interrogatories and take 15 depositions.  (Attachment B to Wittrock Aff.)  On

page 1 of the Pretrial Scheduling Order, the Court clearly set forth that by June 1, 2006,

"All fact discovery of any kind shall be commenced in time to be completed by this

date."  The Court stated at the conference on December 19, 2005, that the deadlines

would not be extended due to the parties' failure to complete their discovery on time.

Nevertheless, at the request of the plaintiffs, the discovery deadline was extended in late

April to July 1, 2006.  (Amended Pretrial Scheduling Order dated April 25, 2006,

Attachment C to Wittrock Aff.)  The original limits on discovery remained in place.  (*Id.*)

All along, Domino's has promptly participated in the Rule 26 process.  First,

Domino's promptly submitted its Rule 26(a)(i) disclosures of the names of persons

believed to possess discoverable information.  (Attachment D to Wittrock Aff.)  That list

included 12 names.  On March 30, 2006, Domino's supplemented its Rule 26(a)(1)(A)

disclosures to add four additional names of persons who were also believed to possess

discoverable information regarding issues that had developed in the case.  (Attachment E

to Wittrock Aff.)  Meanwhile, the plaintiffs have identified only three persons they

believe possess discoverable information pursuant to Rule 26 (*i.e.*, the three individual plaintiffs themselves.  (Attachment F to Wittrock Aff.)

## C.    Discovery Completed to Date.

Anticipating that the Court would want this case to be handled efficiently, Domino's served its first set of written discovery requests on December 6, 2005. (Wittrock Aff. ¶5.)  When Plaintiffs' written answers and responses (served January 24, 2006) and Plaintiffs' subsequent production were incomplete, Domino's promptly wrote a detailed letter under Local Rule 37.1.  (*Id.*)  Later, Domino's promptly brought a few disputes to the Court for an informal resolution.  The Court held a teleconference on March 27, and a written order followed to resolve all issues Domino's had presented to the Court.  (April 21, 2006, Order, Attachment G to Wittrock Aff.)  All told, Domino's has served 22 interrogatories to date.  (Wittrock Aff. ¶6.)

Meanwhile, Domino's also had decided early on what depositions it would need. Plaintiffs Jennifer Huber (February 22), Christopher McCormick (May 2), and Kevin Bores (May 3) were set for their depositions.  The Huber deposition was taken as scheduled on February 22.  In mid-March, Domino's also scheduled depositions of third parties to be taken on April 21 and May 23.  Domino's did take the deposition of third party Ron Warsaski on April 21 in Chicago, as scheduled, and the second third-party deposition has been moved to June 13 at the request of the deponent.  Although Domino's still had not received complete responses to its written discovery requests, Domino's also did take the McCormick and Bores depositions on May 3 and 4, which dates were pushed back one day to accommodate the schedule of Plaintiffs' counsel.

(Wittrock Aff. ¶7.)  The few remaining third-party depositions to be taken by Domino's will be scheduled and completed prior to the July 1 deadline.  (*Id.*)

In contrast to the prompt action by Domino's and its counsel, Plaintiffs did not serve their first sets of written discovery requests until February 17, 2006.  (Wittrock Aff. ¶8.)  Since then, the plaintiffs have served five sets of requests for production of documents, three sets of requests for admissions, and five sets of interrogatories. (Plaintiffs have submitted over 50 interrogatories, counting subparts.)  (*Id.*)

Plaintiffs have not yet taken any depositions.  (*Id.*¶14.)

Shortly after Plaintiffs finally began requesting discovery on February 17, Plaintiffs also began seeking to extend the period in which discovery could be conducted. (Wittrock Aff. ¶10.)  The excuses Plaintiffs have cited for needing more time are moot or of their own making.  (*Id.*)

**D.    Domino's Responsiveness, Production of Documents, and Willingness to Tender Witnesses for Depositions.**

In response to the plaintiffs' requests, Domino's has produced approximately 65,200 pages of documents.  These include documents regarding each of the following:

- The detailed process of developing Domino's PULSE

- Costs of Domino's PULSE, including both development costs and costs to the stores that have installed the system

- Benefits of Domino's PULSE

- Franchisee involvement in the selection of vendors and features of Domino's PULSE

Emails have been included in Domino's production.  (Wittrock Aff. ¶ 4.)

Domino's produced these documents even though the requests were vague and overbroad, appearing to call for production by Domino's of voluminous documents generated over a seven-year period. (*Id.*) In order to expedite matters (given Plaintiffs' delays in proceeding on written discovery) Domino's did not wait for the stipulated protective order to be signed by Plaintiffs' counsel for Domino's to begin producing documents as fast as it could get them gathered, scanned, reviewed for privilege, stamped as "confidential" as appropriate, and Bates numbered. Already on April 7, 2006, Domino's produced the first 10,971 pages of its documents. On April 12, just two days after the confidentiality stipulation was signed by Plaintiffs' counsel, Domino's produced the next 17,729 pages. Immediately after the holiday weekend, Domino's completed the bulk of its production with another set of documents delivered to Plaintiffs' counsel on Monday, April 17. Additional documents have followed as they have been located and processed—between April 18 and May 16, Domino's produced an additional 3,485 pages of its documents. Plaintiffs' counsel also viewed additional electronic documents at Domino's counsel's office on April 26. (Wittrock Aff. ¶12.)

Further, although Plaintiffs' discovery requests did not ask for the production of emails, Plaintiffs have asked for "all emails from all relevant people." Because this request lacks any specificity whatsoever, Domino's asked Plaintiffs' counsel to tailor the request for emails to discover relevant information by specifying parameters such as date ranges, the names of authors and recipients, and/or search terms. Plaintiffs did not provide such parameters until May 11. Domino's promptly responded by producing relevant emails on May 16. Domino's is continuing to review additional emails and

prepare them for production, and it has incurred substantial costs in searching for and retrieving emails, including purchasing software to search for emails in accordance with the parameters that Plaintiffs provided. (*Id.*)

Domino's also responded to Plaintiffs' second set of interrogatories on April 6, before they were due. (*Id.* ¶13.) Domino's responses to Plaintiffs' third and fourth sets of discovery (served April 6-7), were served without extension on May 5. (*Id.*)

Plaintiffs also have requested the depositions of witnesses currently or previously employed by Domino's, as well as independent contractors and other third parties. Once again, in contrast to Domino's, which has sought four-and-one-half days of depositions, Plaintiffs have stated an intention to take at least 17 depositions. Nevertheless, Domino's has agreed to produce for depositions its employees, former employees, and contractors, to the extent those depositions have been requested by the plaintiffs. The only exceptions are the few depositions that are the subject of this motion.

Domino's originally arranged to produce its employees, former employees, and contractors for depositions in two three-day groups as follows:

| | |
|---|---|
| April 26 | Tim Monteith and Jim Vitek |
| April 27 | Matt Maguire and David Ziemba |
| April 28 | Don Reichert |
| May 16 | Harry Silverman and Chris Demery |
| May 17 | Chris McGlothlin and Mike Soignet |
| May 18 | Jim Stansik |

(Wittrock Aff. ¶15.) Plaintiffs unilaterally decided not to take those depositions. (*Id.*)

To accommodate Plaintiffs once again, and by agreement with Plaintiffs' counsel, Domino's scheduled the persons Plaintiffs had requested for depositions as follows:

| | |
|---|---|
| April 26 | Tim Monteith and Jim Vitek |
| May 16 | Harry Silverman and Chris Demery |
| May 17 | Jim Vitek and David Ziemba |
| May 18 | Matt Maguire and Mike Soignet |
| May 31 | Chris McGlothlin and Don Reichert |
| June 1 | Tim Monteith |
| June 7 | Jim Stansik |

(*Id.* ¶16.) Plaintiffs once again abruptly announced recently that they would not be taking any of these depositions without a Court order to do so. (*Id.*)

Six of the remaining seven witnesses Plaintiffs have said they will depose are third parties that Domino's cannot produce (including "Pizza Hut designee" and "Papa John's designee"), but Domino's counsel advised Plaintiffs' counsel to schedule those depositions whenever the witnesses can be subpoenaed and are available prior to the discovery deadline. (*Id.* ¶17) The only other requested witness is Domino's Chief Executive Officer, who Plaintiffs scheduled to depose on the day following Memorial Day. Domino's is agreeing to produce senior executives Mr. McGlothlin (current Chief Information Officer), Mr. Soignet (an Executive Vice President), and Mr. Stansik (an Executive Vice President and the top franchise officer of the company), along with former top executives Mr. Silverman (an Executive Vice President and CFO) and Mr. Monteith (an Executive Vice President and CIO). (*Id.* ¶18)

## E.     Plaintiffs' Lack of Discovery Compliance.

The Court, on April 21, entered a written Order that the plaintiffs do the following:

- Answer Interrogatory No. 1 individually and completely

- Answer Interrogatory No. 3 and identify and produce responsive documents

- Answer Interrogatory No. 6

- Answer Interrogatory No. 7

- Produce documents in response to Request for Production No. 4 and identify the documents and the source thereof.  Plaintiffs also were ordered to inform Domino's "which pages comprise a single document, and which pages were attached to other pages (so defendant can understand which pages of a document were attachments to a document)."

(April 21 Order at pp. 1-2, Attachment G to Wittrock Aff.)

Over 30 days have gone by and Plaintiffs have not complied with any of the above-listed aspects of the Court's April 21 Order.  (Wittrock Aff. ¶19.)  Further, some parts of the Court's Order date back even longer, to the oral hearing on March 27, 2006, when Plaintiffs agreed to or were required to provide further responses.  (See April 21 Order at pp. 1-3, Attachment G to Wittrock Aff. (referencing outcome of telephone conference).)  Despite being reminded of this Order once again at the depositions of Plaintiffs Christopher McCormick (May 3) and Kevin Bores (May 4), Plaintiffs continue to ignore the Order.  This is particularly troubling because Mr. Bores testified that he was not even sure that he had seen the Court's Order, and that "It doesn't look familiar" to him.  (Bores Tr. at 35-36, Attachment H to Wittrock Aff.)  As to certain points referenced in the Court's Order, however, Mr. Bores testified that he provided information to counsel but he stated, "I don't know if it's been formally handed over or not.  I know that a process has begun to deal with it, but . . . ."  (*Id.* at 40.)  Mr. McCormick testified that he believed he had provided additional information for interrogatory answers, that he had searched for documents ordered by the magistrate judge to be produced, and that he had turned those documents over to Plaintiffs' counsel to be produced.  (McCormick Tr. at

285-88, Attachment I to Wittrock Aff.)  Yet Defendant has not received the same.

(Wittrock Aff. ¶20.)

**F.     Behavior of Plaintiffs' Counsel at Depositions.**

      The subject of the behavior by plaintiffs' counsel has already been before the

Court.  The Court's April 21 Order stated:  "this Court agrees that plaintiffs' counsel did

engage in numerous speaking objections."  (Attachment G at p. 6.)  Plaintiffs' counsels'

instructions "did end up suggesting to [plaintiff Huber] how to respond."  (*Id.* at 7.)

Therefore, the Court instructed counsel as to the impropriety of such objections, as well

as instructions of witnesses not to answer based on relevancy.  (*Id.* at pp. 6-7.)

      Plaintiffs' lead counsel, however, continued and in some ways accelerated the

same pattern of behavior at the next depositions he attended, which were the May 3 and 4

depositions of plaintiffs Christopher McCormick and Kevin Bores.  Whereas in the

Huber deposition plaintiffs' counsel objected on 122 of the 234 pages of the transcript,

the same counsel's objections are found on 164 of the 283 pages (58 percent) of the

McCormick deposition transcript and on 78 of the 141 pages (55 percent) of the Bores

deposition transcript—sometimes multiple times on a single page.  Some of these

objections continued to be "speaking objections" that were designed to suggest to the

witness how to answer the question – or not answer, as the case may be.  (*See, e.g.*,

Attachment I at pp. 52, 85, 199; Attachment H at pp. 19, 90, 91, 131.)  It is instructive to

note by comparison that, at the only other deposition in the case, which was taken by the

same lawyer for the defendant (Mr. Wittrock) as were the other three depositions,

plaintiffs' counsel (Mr. Blumenthal) raised only two objections in around an hour of questioning.  (Wittrock Aff. ¶ 22 and Attachment J thereto.)

Plaintiffs' counsel also once again, and in direct violation of the Court's April 21 Order, instructed witnesses not to answer without proper grounds and without immediately making a motion for a protective order, as the Court at page 7 of the Order reminded plaintiffs' counsel he must do.  (Attachment I at 201; Attachment H at 34.)

Moreover, when the parties appeared for the McCormick and Bores depositions, plaintiffs' lead counsel at first refused to go forward with the depositions at all.  While failing and refusing all requests to state any legal basis for his position, plaintiffs' lead counsel was unwilling to proceed as long as Mr. Matthew Maguire, the head of the Domino's PULSE project for the defendant, was present as a corporate representative at the depositions.  (Transcript of Proceedings at pp. 3-4, Attachment L to Wittrock Aff.) This unfounded refusal led to a delay while defense counsel was required to call the chambers of both the magistrate judge and the district court judge assigned to this action. (*Id.* at pp. 5-12.)  Finally, after strange attempts to extract unrelated concessions from the defendant, counsel for the plaintiffs changed his mind and allowed the depositions to begin.  (*Id.* at 12.)  Mr. Maguire's presence at the depositions did not cause any issue, as he never said a word and merely acted as an observer on behalf of the defendant. (Wittrock Aff. ¶ 24.)

## G.    Behavior of Plaintiff's Counsel in Writing.

The conduct of plaintiffs' lead counsel has perhaps been most unusual and counterproductive, however, through his written communications in the case.  Mostly, the

unusual communications have been in emails, which are characterized by hyperbole and sarcasm. The sad irony and unhelpfulness of counsel's style will be shown by reading through the following examples, all of which are included chronologically in Attachment L to the accompanying affidavit:

- "With all the discovery remaining, it is very counterproductive for either party to take intransigent positions. Best, Jeff." (Email dated March 21, 2006, found at page 4 of Attachment L to Wittrock Aff.)

- "They're [the scheduled depositions] not happening unless the Court orders them to proceed. Period. We'll serve you with the Stay Motion tomorrow. Don't expend any resources on preparing or traveling. Best, Jeff." (Email dated April 19, 2006; *id.* p.17.)

- "If you have not produced by tomorrow the [documents] requested specifically in Plaintiffs' Third Request for Documents, we will seek sanctions as provided for in Section 1927. Period....Best, Jeff" (Email dated May 11, 2006; *id.* p. 25.)

- "Request for Consent to Entry of Default Judgment Against Domino's." (Subject line of email dated May 10, 2006; *id.* p. 21.)

- "We'll now let the Judge examine your prolonged and apparently never-ending conduct under the lens of appropriate discovery conduct by large firms in complex litigation. I believe that your conduct is one upon which a default judgment should be entered. We'll be requesting that relief tomorrow. Also, we expect you to produce this week the Custodian of Records for Domino's to testify as to the affirmative steps he or she took to cull out of the documents you produced

every arguably relevant document.  Not one email?  I'm eager to see how you explain to the Court how and why your conduct is different from those lawyers who have been sanctioned for far less prejudicial discovery conduct.  In the event you expect me to seek your consent to the Motion for Default Judgment that we'll be filing tomorrow, this email is that request.  Best to Mike.  Jeff"  (Email dated May 10, 2006; *id.* p. 21.)

- "Notice of Intent to Seek section 1927 Sanctions" (Subject line on May 11, 2006, email demanding production of documents the plaintiffs had already received; *id.* p. 25.)

- "Again, that must be a page out of your local practice." (May 11, 2006, email; *id.* p. 23.)

- "Again, perhaps that is something unique to the litigation community in your area. . . . If we're going to have to depose your guys in their offices and have them walk us all through their physical files and desk top computers, on the record, then that's what we're going to have to do.  That will be a very painful and inefficient process for us all to have to endure." (April 13, 2006, email; *id.* p. 12.)

- "Rule 11" (Subject line on one of seven emails received in a span of 81 minutes from plaintiffs' counsel on the evening of Sunday, May 14, 2006 (Mother's Day) ; *id.* p. 26.)

- "perhaps there have been recent amendments to the Federal Rules that I haven't yet seen…I would appreciate either you or Quentin sending me a copy of the pages of that book that address the above two severely prejudicial glaring

violations of the Federal Rules by Domino's.  Best, Jeff"  (April 13, 2006, email; *id.* p. 14.)

- "You have enough guys on your side to unload and scan 10 tons of documents in a day."  (April 7, 2006, email; *id.* p. 8.)

- "And now, the time has come…(Frank Sinatra).  Bottom line:  Big Firm; Big Franchisor; Big dollars: Big numbers of People including paralegals and lawyers; Big Commercial litigation experience; Big capability; Big certainty as to positions taken during litigation; ERGO: little room for arguing that your complete refusal to have produced documents was anything other than intentional (regardless of who was sitting where and in whose office)."  (April 7, 2006, email after plaintiffs' counsel failed to appear for meet and confer session scheduled to meet plaintiffs' lead national counsels' schedule; *id.* p. 8.)

- "Cool your jets"  (Email dated April 17, 2006, after Domino's counsel had responded to a threat by explaining that information already had been provided. Counsel for Domino's had concluded:  "Please do not write again demanding things that I have already provided to you, and threatening to go to the magistrate judge."; *id.* p. 15.)

- "Quentin: perhaps you've been in a time warp for the last month.  Mike will fill you in.  Best, Jeff"  (Email dated April 19, 2006, in response to a message from Domino's counsel that the "The parties could simply continue to complete discovery as scheduled."; *id.* p. 18.)

- "Neither of us has time to play games during discovery." (March 30, 2006, email; *id.* p. 6.)

- "This is notice that plaintiffs hereby withdraw their consent to any previous agreements that arguably were reached between the parties." (Letter dated April 20, 2006; *id.* p. 20.)

- "Games, games, games…" (April 12, 2006, email; *id.* p. 11.)

- "as you may know, the way we practice is to always honor requests like your [sic]; however, in this case, the clients have requested that they meet as a group to decide this and the related question of how we are all going to be able to complete quite a few depositions in such relatively short order. We hope to meet with our clients later today and to get a reply. Best, Jeff" (Email dated March 17, 2006, in response to a request for a two-week or ten day extension of time to respond to plaintiffs' first set of discovery requests; *Id.* p. 1.)

**H.     Costs and Delays Caused by Plaintiffs' Discovery Tactics and Requests.**

Already the costs to Domino's in defending this case have been disproportionately high when compared to the straightforward, primarily legal issues involved. Plaintiffs appear to have taken an approach of requesting whatever would be the most difficult, costly, and time-consuming documents to produce; demanding a deposition of whatever witness would be the most inconvenient for Domino's to have deposed (and at the most inconvenient time); and doing whatever else would make Domino's and its counsel uncomfortable, such as all the groundless threats of various sanctions. In addition to causing the cost of responding to all of the above tactics, the plaintiffs have also

attempted to prolong this agony as long as possible. Since early on the plaintiffs have been untimely, requested delays, simply delayed things on their own without agreement, and sometimes moved the Court to extend the case. So far, the dispositive motion and trial deadlines have not been moved, but Domino's expects the plaintiffs will seek such a delay in the near future.

## I.   Plaintiffs' Discovery Requests From Which Defendants Need Protection.

Notwithstanding all of the problems generally caused by Plaintiffs' tactics in this case, Domino's is only asking the Court for a protective order with respect to three specific issues. Those issues, as addressed in the following sections, involve (1) Plaintiffs' request for a Rule 30(b)(6) deposition on an irrelevant topic on which Domino's, to move the case along, has already produced documents and full interrogatory answers (despite the irrelevance of the discovery requests); (2) the deposition at this time of Domino's Chairman and CEO David Brandon; and (3) the taking of a separate deposition of a "Custodian of Records"—a position that Domino's does not have—as a second deposition of the same person who Domino's will tender for a full deposition on all relevant topics, including documents. (Plaintiffs also on April 19, 2006, requested a deposition of "Legal Counsel for Domino's." Apparently, however, the plaintiffs have withdrawn that request, so it is not the subject of the current motion.)

### 1.   Deposition Notices of Corporate Designees Regarding Interrogatories That Sought Irrelevant Information.

Plaintiffs' Third Set of Interrogatories consisted of two interrogatories. On Friday, May 5, 2006, Domino's timely answered the portions of those interrogatories that dealt

with computer systems, and objected to the bulk of the other portions of these two

interrogatories.  (Attachment N to Wittrock Aff.)  These interrogatories and the responses

thereto are quoted fully below in Section B of the Argument, *infra*.  On May 12, 2006,

Plaintiffs served two notices for a corporate designee or designees to testify "by

telephone" three business days thereafter, on May 17.  (Attachment O to Wittrock Aff.)

The notices sought "[t]he person or persons most knowledgeable about Domino's

Answer to Interrogatory 1" and "[t]he person or persons most knowledgeable about

Domino's Answer to Interrogatory 2."  (*Id.* pp. 1-4.)  That same day, Plaintiffs served

amended notices for the same designees for May 25, 2006.  (*Id.* pp. 5-9.)  Yet again the

same day, Plaintiffs served second amended notices for the same date.  (*Id.* pp. 10-13.)

As more fully explained below, Domino's requests a protective order precluding

these depositions because they seek testimony about interrogatories to which Domino's

has standing objections and, more importantly, are overly broad, unduly burdensome,

irrelevant, and not likely to lead to the discovery of admissible evidence.

### 2.    Deposition Notice of David Brandon.

Plaintiffs have noticed the depositions of most of the current and former top

officers of Domino's, including David Brandon, the highest ranking corporate officer of

the company.  Mr. Brandon is the Chairman and Chief Executive Officer.  (Wittrock Aff.

¶29 .)  Plaintiffs noticed his deposition for May 30, 2006, the day following Memorial

Day, in a Notice the plaintiffs have not clearly withdrawn.  (Attachment R to Wittrock

Aff.)  Domino's has tendered the other witnesses named in plaintiffs' deposition notices,

so the only individual deposition this motion seeks to preclude is that of Mr. Brandon.

### 3.    Notice of Deposition of "Custodian of Records."

On April 19, 2006, Plaintiffs served a notice for the deposition of Domino's "Custodian of Records" to take place on May 5, 2006, in an unspecified location in "Ann Arbor, Michigan." (Attachment M to Wittrock Aff.)  Domino's advised Plaintiffs that it does not have a "Custodian of Records," but that the individuals who have knowledge about documents were already on the list of deponents, and those individuals would only be produced once and not a second time for the purposes of seeking testimony regarding the production of documents. (Wittrock Aff. ¶32.)  At 6:11 p.m. on Monday, May 8, when plaintiffs' counsel knew defense counsel were out of state at a franchise law conference, plaintiffs' counsel served a notice of deposition for the custodian of records again, to be held by telephone some 40 hours later, on the morning of Wednesday, May 10. (*Id.* Att. U.)  Plaintiffs did not take the deposition, nor did they call or otherwise arrange for there to be a deposition. (Wittrock Aff. ¶32.)  But, plaintiffs now demand the deposition once again  (Attachment V to Wittrock Aff.), forcing Domino's to seek protection.

### ARGUMENT

### A.    Standard.

Despite the liberal limits set for the scope of discovery, this Court may limit discovery if

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information

sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(2).  Moreover, this Court may issue a protective order prohibiting or limiting the scope of discovery upon a good cause showing that such an order is required to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c).  As shown in detail below, Domino's has met this standard for protection on each of the subjects of this limited motion.

**B.     This Court Should Preclude the Separate and Additional Depositions of Corporate Designees with Respect to Interrogatory Nos. 1 and 2 (Third Set), Which Interrogatories and Depositions Seek Irrelevant Information.**

Plaintiffs' Interrogatories Nos. 1 and 2 (Third Set) and Domino's responses to each, read as follows:

**INTERROGATORY NO. 1:**  With regard to **all items for which DPLLC provides third-party approval to franchisees**, list and describe all testing procedures and conforming procedures utilized by DPLLC to identify and approve vendors.  (Emphasis added.)

**ANSWER:**  This interrogatory is vague as to the phrase "identify" vendors.  This interrogatory is also overly broad as to testing and approval of "all items".  Without waiving any objection, Defendant states that because of the varied nature of products used in the Domino's Pizza system it is impossible and unwise to have a single set of evaluating requirements and criteria.  In addition, different persons in different units of the organization possess the requisite skills and experience to evaluate products.  For example, the criteria for evaluating signage or floor tiles is necessarily quite different from the criteria to evaluate food products and food contact items.  As a result, the persons who evaluate items such as signage are not the same persons who evaluate meat products, for example.  At the same time, some products are of such a generic nature that there are no "approved" suppliers.  Interior and exterior doors, light fixtures and light bulbs, and  "open" signs are examples.  Even though there are not approved suppliers for many items (i.e., "open" signs) there are standards relating to the size, shape, color, etc. of these items.

Approved suppliers may manufacture a variety of items in their line of business but the items one class of approved suppliers manufactures for Domino's Pizza are not available to any other customer. This applies specifically to the following proprietary products: boxes, cooked beef, Buffalo Kickers, Buffalo Wings, pepperoni, cheese for pizza, flour, Premix, sauce for pizza, cooked Italian sausage, Blue Cheese dipping sauce, breadstick shake-on seasoning, cinnamon sugar blend, garlic sauce, hot sauce, marinara sauce, ranch dipping sauce, etc. Other approved vendors are approved only for a limited number of specific products. Some examples include: bacon, cheddar cheese, dough oils, ham, olives, hot peppers, pineapple and yeast.

A CONFIDENTIAL copy of the Supplier Qualification Questionnaire / Audit will be produced subject to the Court's Protective Order. Following completion of this process a vendor submits samples which are further tested and evaluated.

In addition, some construction items are limited to approved suppliers. These include: signage, floor tile in the customer area, window graphics, customer area paint, and certain neon window signs. These vendors were selected through a detailed bidding process.

The Equipment and Supply division evaluates most of the remaining required products; such as, ovens, counters, etc.

Defendant's Information Services department, in consultation with an independent consultant, developed a number of criteria for a point of sale system. The department also consulted with an expert consultant on the process to evaluate and select the basis for a custom-designed point of sale system. Franchisees were consulted with regard to functions and features that were important in their view. At least two franchisee surveys were conducted in addition to numerous meetings attended by franchisees. Defendant followed the procedures, criteria and guidelines established in conjunction with the expert consultants, and results of the franchisee surveys, in order to develop a list of approximately 60 software vendors to contact. Through application of the established process this number was reduced to a dozen or so, and through further due diligence five finalists were selected. These finalists came to Ann Arbor to make a day long presentation. Following the presentations a vendor was selected and the development team then began developing the customized product now known as Domino's PULSE. Documents further describing this process have already been produced.

**INTERROGATORY NO. 2:**  For **each vendor** that has been
approved under relevant provisions of the DPLLC Franchise Agreement to
provide **any product, material, or service to Domino's franchisees**,
identify the vendor and the product, material or service for which they have
been approved.  (Emphasis added.)

**ANSWER:**  This interrogatory is overly broad as to testing and
approval of "any product, material, or service" and vague and
argumentative.  The Domino's Pizza Approved Supplier List is confidential
and proprietary and is not distributed to franchisees unless the franchisee
has already been approved to operate a class A or class B commissary.
None of the plaintiffs operate a class A or class B commissary.  All of the
plaintiffs purchase the supplies they need to operate their stores from
Defendant.  Consequently, Defendant objects to disclosing the names of its
suppliers for the reason that the names are not relevant and are not likely to
lead to the discovery of admissible evidence.  Without waiving any
objection, Defendant has approved suppliers for the following items: boxes,
cooked beef, Buffalo Kickers, Buffalo Wings, cheese for pizza, flour,
Premix, sauce for pizza, cooked Italian sausage, BBQ sauce, Blue Cheese
dipping sauce, breadstick shake-on seasoning, cinnamon sugar blend, garlic
sauce, hot sauce, marinara sauce, ranch dipping sauce, wing sauces, bacon,
cheddar cheese, dough oils, ham, olives, pepperoni, hot peppers, pineapple,
yeast, signage, floor tile in the customer area, window graphics, customer
area paint, and certain neon window signs, ovens, counters, etc., other
toppings, other cheeses, packaging and non food items used in a store,
beverages, salads, cleaning chemicals, other oils, corn meal, corrugated
liners, other seasonings, and sub sandwich ingredients.

With regard to Domino's PULSE, Defendant is the only approved
supplier of software in part because Defendant has developed and created
Domino's PULSE as a proprietary custom-designed system specifically for
use in the Domino's Pizza delivery business.  IBM, NCR and franchisees
have contributed to the selection or development of Domino's PULSE and
have evaluated it. Other third party software vendors have supplied
products which are incorporated in Domino's PULSE.  The names of these
vendors are set out in the Domino's PULSE License Agreement, a copy of
which has already been furnished to plaintiffs.

(Attachment N to Wittrock Aff.)

As shown in the responses quoted above, Domino's properly asserted objections to

Interrogatories Nos. 1 and 2 of the Third Set, while, at the same time, providing

thousands of pages of documents and other information and explanation pertaining to the

point of sale computer system that is the subject of this lawsuit.  How Domino's might

select, for example, a supplier of meat with a proprietary flavoring is wholly irrelevant to

the central issue in this lawsuit, which is: are the plaintiffs bound by their written

agreements to establish and retain a computer and point of sale system conforming to the

requirements prescribed by Domino's.  The objections Domino's offered in response to

these interrogatories stand, unless Plaintiffs bring a motion to compel and the Court

overrules the objections.  Plaintiffs, instead, have merely ignored the objections and have

not even attempted to work through the objections with Domino's.  Indeed, Domino's

served its objections on May 5, 2006.  Yet, in a letter to Domino's dated May 8, 2006,

Plaintiffs confusingly stated, "Domino's has not responded to [Plaintiffs' Third Set of

Interrogatories.]  Please respond immediately."  (Wittrock Aff. Attachment P at 5.)  In a

letter dated May 17, 2006, Domino's corrected the record by reminding plaintiffs'

counsel that indeed these interrogatories had been answered.  (Wittrock Aff. Attachment

Q at 11.)

        In any event, depositions on the subjects of these two interrogatories would be

unduly burdensome because the information sought is overly broad, irrelevant, and not

reasonably calculated to the discovery of admissible evidence.  Interrogatory No. 1 seeks

information about the testing and approval of "all items."  Presumably, that would

include such wholly irrelevant items as cheese, signage, bacon, and uniform shirts.  As

indicated in Domino's answer, this is vague and overly broad, as there are many different

persons in many different units of the organization that evaluate many different products,

ranging from meat to floor tiles. None of those products pertain to this case. For Domino's to designate the persons involved with approval of all such products would be unduly burdensome. More importantly, any testimony from the depositions would be irrelevant to the parties' contractual rights and obligations with respect to computer hardware and software systems used in the *Domino's Pizza* stores. Domino's answered the portion of the interrogatory related to the selection of computer hardware and software systems, and the persons involved in that process have already been tendered for depositions that the plaintiffs cancelled. (Attachments N and T to Wittrock Aff.)

Similarly, Interrogatory No. 2 seeks information about vendors approved to provide "any product, material, or service" to franchisees. As indicated in Domino's answer, this question is vague and overly broad, for the same reasons as discussed above with respect to Interrogatory No. 1. Plaintiffs purchase all supplies they need to operate their stores from Domino's and, thus, identification information regarding other vendors is irrelevant. In sum, the Court should preclude Plaintiffs from deposing corporate designees as to interrogatories to which Domino's has standing objections and, in any event, are irrelevant and not likely to lead to the discovery of admissible evidence.

The requests for special depositions regarding Interrogatory Nos. 1 and 2 are consistent with the plaintiffs' efforts to make this case as tedious and costly to Domino's as the plaintiffs can make it. For the reasons set forth above, a protective order preventing these depositions should issue so that the case can focus on the real issues.

C.     **This Court Should Preclude Mr. Brandon's Deposition.**

    1.     **Courts Routinely Preclude Depositions of High-Level Executives.**

Federal courts commonly enter orders protecting top-ranking business executives from unfettered discovery, because these courts recognize that depositions "would threaten disruption of their business and could serve as a potent tool for harassment in litigation." *Consol. Rail. Corp. v. Primary Indus. Corp.*, 1993 U.S. Dist. LEXIS 12600, at *2 (S.D.N.Y. Sept. 10, 1993); *accord Treppel v. Biovail Corp.*, 2006 U.S. Dist. LEXIS 7836, at *4 (S.D.N.Y. Feb. 28, 2006).  Because high-ranking executives can easily be subjected to undue harassment, the District of Minnesota has recognized that "courts frequently restrict efforts to depose senior executives . . . where the party has not established that the executive has some ***unique*** knowledge pertinent to the issues in the case." *Cardenas v. Prudential Ins. Co. of Am.*, 2003 U.S. Dist. LEXIS 9510, at *2-3 (D. Minn. May 16, 2003) (emphasis added) (precluding depositions of several high-ranking executives because the plaintiff failed to demonstrate that they "personally possess[ed] any unique information about the case");  *see also McMahon v. Presidential Airways, Inc.*, 2006 U.S. Dist. LEXIS 4909, at *6 (M.D. Fla. Jan. 18, 2006) ("A protective order precluding the deposition of a high-ranking executive officer will be granted where the officer possesses no unique knowledge regarding the underlying facts of the action…."); *Treppel v. Biovail Corp.*, 2006 U.S. Dist. LEXIS 7836, at *6 (S.D.N.Y. Feb. 28, 2006) ("Unless the executive has some unique knowledge, it may be appropriate to preclude a redundant deposition of that individual." (internal quotations omitted)); *Baine v. Gen. Motors Corp.*, 141 F.R.D. 332, 335 (M.D. Ala. 1991) (issuing a protective order quashing

the deposition of a company vice president who did not have "any superior or unique personal knowledge" of the issues).

Although no court within this jurisdiction has analyzed the scope of the "unique knowledge" standard, at least one state supreme court has recognized that the standard is a rigid one.  The examining party cannot satisfy the standard by a mere showing that the executive has "some knowledge."  *In re Alcatel USA, Inc.*, 11 S.W.3d 173, 177 (Tex. 2000).  Rather, unique knowledge requires a showing beyond mere relevance—i.e., the examining party must show that the executive possesses knowledge of relevant facts that is "greater in quality or quantity than other available sources."  *Id.* at 179.

Even when a high-ranking executive has some discoverable knowledge, courts often appropriately require the examining party to first attempt to obtain the same information through less intrusive discovery.  For example, courts frequently require the examining party to first depose lower-ranking employees.  *Consol. Rail.*, 1993 U.S. Dist. LEXIS 12600, at *2-3.  As reasoned by the Fifth Circuit, the other employees may have "the most direct knowledge of the relevant facts" and it is "therefore very likely that, after taking the other employees' depositions, plaintiff would be satisfied and abandon her requests to depose [the high-level executive]."  *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979); *see also Baine*, 141 F.R.D. 335 (precluding deposition of vice president when plaintiff failed to "establish[] that the information necessary cannot be had from [the other employees]"); *Treppel*, 2006 U.S. Dist. LEXIS 7836, at *7 (issuing a protective order when "plaintiff has made no attempt to depose any lower level executives and, at the time he noticed the depositions, document discovery had not been completed");

*Evans v. Allstate Ins. Co.*, 216 F.R.D. 515, 519 (N.D. Okla. 2003) (issuing protective

order when "the information can be alternately obtained from other sources without

deposing these 'apex' officers"); *Cardenas*, 2003 U.S. Dist. LEXIS 9510, at *2

(precluding deposition "where the party seeking the deposition can obtain the same

information through less intrusive means"); *Harris v. Computer Assocs. Int'l, Inc.*, 204

F.R.D. 44, 46 (E.D.N.Y. 2001) ("When a vice president can contribute nothing more than

a lower level employee, good cause is shown to not take the deposition."); *Consol. Rail.*,

1993 U.S. Dist. LEXIS 12600, at *2-3 ("[W]here other witnesses have the same

knowledge, it may be appropriate to preclude a redundant deposition of a highly-placed

executive."); *M.A. Porazzi Co. v. Mormaclark*, 16 F.R.D. 383, 383 (S.D.N.Y. 1951)

(precluding deposition because executive "could contribute nothing beyond that which

would be gleaned from an examination of [a lower-level employee]").

        In addition to requiring the examining party to first depose other employees with

more direct knowledge, courts have fashioned other remedies to reduce the burden on the

executive and the potential for duplication.  For example, one federal district court

ordered that the plaintiffs first serve written interrogatories and take corporate depositions

before any subsequent notice to depose the high-level executive.  *Baine*, 141 F.R.D. at

336.  Such remedies "could satisfy some of the plaintiffs' needs" or, at the very least,

"aid in developing and refining a line of questioning," thereby lessening the burden and

avoiding duplication.  *Id.* at 335.  Still another federal district court allowed the

deposition of an executive who had unique personal knowledge of the relevant facts, but

nevertheless issued an order identifying the topics for the deposition, limiting the

deposition to one-half day, and requiring plaintiffs to first conduct Rule 30(b)(6) depositions. *See Folwell v. Hernandez*, 210 F.R.D. 169, 174-75 (M.D.N.C. 2002).

### 2.     Mr. Brandon Has No Unique Knowledge.

As Domino's Chairman and CEO, Mr. Brandon is responsible for overseeing a company that operates a franchise system with approximately 8,000 stores worldwide and that employs approximately 13,500 people.  (Wittrock Aff. ¶30.)  The extensive scope of Mr. Brandon's duties and responsibilities restricts his availability to sit for a deposition, which would be unduly burdensome and disruptive of Domino's business.  (*Id.*)

More importantly, Mr. Brandon lacks unique knowledge about the facts relevant to this case.  (*Id.*)  Mr. Brandon is involved at the highest level of decision making regarding the company's strategic business planning.  (*Id.*)  As such, he has only no unique knowledge regarding the rights and obligations of the parties under the franchise agreements.  In any event, this is a legal question, and any relevant information is found in the contracts and other documents already produced.

To the extent that Plaintiffs seek to depose Mr. Brandon specifically about the Domino's PULSE system, he has only the highest level of knowledge.  He was not directly involved in the research and development of the Domino's PULSE system, which occurred during the 1998 through 2002 timeframe.  The development of Domino's PULSE is a highly technical project and Mr. Brandon possesses no formal training in computer programming and has no unique knowledge about computers.  (*Id.*)

The parties' initial disclosures confirm Mr. Brandon's lack of relevant, unique knowledge about the issues in this case.  Indeed, neither Plaintiffs nor Domino's included

Mr. Brandon's name in the list of persons likely to have knowledge of relevant information.  (*See* Attachments D-F to Wittrock Aff.)  If the parties believed that Mr. Brandon had knowledge relevant to the case, they would have identified him as such.

To the extent that Mr. Brandon possesses any information relevant to the issues in this case, such information is not unique as it is fully available from other sources, namely the persons identified pursuant to Rule 26 and the deponents already noticed in this case.  Indeed, Domino's agreed to make available for depositions at least ten of Domino's former and current employees or contractors who have the most direct knowledge of the relevant facts.  These include the Executive Vice President of Franchising (James Stansik), the current Chief Information Officer (Christopher McGlothlin), the former CIO (Timothy Monteith), the former Chief Financial Officer (Harry Silverman), and the head of the Domino's PULSE project (Mr. Maguire).  These individuals have more direct knowledge of and involvement with the PULSE project.  In sum, Mr. Brandon's knowledge of the Domino's PULSE system is limited and not unique, which amounts to good cause for a protective order precluding his deposition.

Even if the Court finds that Mr. Brandon has discoverable information, it should nevertheless require Plaintiffs to first complete less intrusive discovery before renoticing the deposition, if necessary.  Indeed, deposing Mr. Brandon at this time would be oppressive, inconvenient, and burdensome inasmuch as the discovery completed to date shows that Plaintiffs can glean necessary information from individuals with the most direct knowledge of the Domino's PULSE computer system.  Any information that Mr. Brandon has regarding the system will be merely redundant and duplicative of the

testimony from these individuals who have the most direct knowledge. Indeed, Plaintiffs cannot demonstrate that Mr. Brandon possesses knowledge of relevant facts that is greater in quality or quantity than the knowledge of these individuals or other available sources. Thus, this Court should issue a protective order requiring Plaintiffs to complete the scheduled depositions and/or complete other less intrusive discovery before any subsequent notice to depose Mr. Brandon.

**D.     No Separate Deposition of a "Custodian of Records" Should Be Taken.**

Plaintiffs now insist upon beginning with a separate, preliminary deposition of a "Custodian of Records." Domino's informed Plaintiffs that it does not have an employee designated as the "Custodian of Records." Surely, Domino's cannot be expected to produce an individual who does not exist. In addition, the individuals most knowledgeable about documents that are relevant to this lawsuit are on the long list of deponents Domino's already agreed to tender for full depositions on all relevant topics, including documents. A preliminary deposition of the same person solely on the issue of documents would be unreasonably duplicative, burdensome, and expensive. Fed. R. Civ. P. 26(b)(2)(i). Plaintiffs will have ample opportunity to obtain the information sought in one deposition. Fed. R. Civ. P. 26(b)(2)(ii). Thus, this Court should issue a protective order precluding the separate, preliminary deposition of a "Custodian of Records."

## CONCLUSION

For the reasons set forth above, Domino's respectfully requests that the Court issue a protective order to preclude the plaintiffs from further belaboring this case through the four specific, unusual depositions. Corporate representatives should not have

to be produced to testify as to the two interrogatories in the Third Set.  Mr. Brandon should not be required to testify when others in the company have all relevant information.  And no "Custodian of Records" should be appointed to testify when no such individual exists and the witnesses involved with the documents and the production thereof are already going to be deposed.

Dated:  May 22, 2006                          GRAY, PLANT, MOOTY,
                                              MOOTY & BENNETT, P.A.


                                        By s/ Quentin R. Wittrock
                                              Michael R. Gray (#175602)
                                              Quentin R. Wittrock (#179061)
                                              June E. Pineda (#033330X)
                                           500 IDS Center
                                           80 South Eighth Street
                                           Minneapolis, MN  55402
                                           Telephone:  (612) 632-3000
                                           Facsimile:  (612) 632-4444

                                           **ATTORNEYS FOR DEFENDANT**

GP:1943929 v1