## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Kevin Bores, *et al.*,

                                        Plaintiffs,

                                                 Civ. No. 05-2498 (RHK/JSM)
                                        **MEMORANDUM OPINION AND**
                                        **ORDER**

v.

Domino's Pizza LLC,

                                        Defendant.

---

J. Michael Dady, Scott E. Korzenowski, Clarence J. Kuhn, Dady & Garner, P.A., Minneapolis, Minnesota, Thomas W. Pahl, Joseph M. Barnett, Foley & Mansfield, Minneapolis, Minnesota, for Plaintiffs.

Michael R. Gray, Quentin R. Wittrock, June E. Pineda, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

To borrow language from one recent case, the parties in this case were "once friends and collaborators [but] now [are] enemies and scorched-earth litigators." Topps Co., Inc. v. Cadbury Stani S.A.I.C., 454 F. Supp. 2d 89, 90 (S.D.N.Y. 2006). They have left no stone unturned during the 18 months that this case has been pending; they have filed more than 20 motions (an average of over one per month), and have litigated this case with increasing acrimony, having recently sought the imposition of sanctions on three separate occasions.[1]

---

[1] In one instance, Magistrate Judge Mayeron issued a 113-page Order disposing of a plethora of discovery-related motions, which included two sanctions motions and a motion for attorneys' fees under Federal Rule of Civil Procedure 37.

One such sanctions motion (pending before Magistrate Judge Mayeron) seeks the "ultimate sanction" of dismissal for Plaintiffs' allegedly contumacious conduct.

At bottom, however, this case is, and has been from the outset, little more than a garden-variety breach-of-contract dispute.[2]  The parties have now cross-moved for summary judgment.  For the reasons set forth below, the Court will grant in part and deny in part each cross-Motion.

## BACKGROUND

Domino's Pizza LLC ("Domino's") is a well-known pizza franchise.  As of January 1, 2006, there were 5,007 Domino's stores in the United States, with 4,426 stores owned by franchisees and 581 stores corporate-owned.  (Korzenowski Aff. Ex. A at 3.)

Most of the corporate Plaintiffs here – Blue Earth Enterprises, Inc. ("Blue Earth"), Mid America Pizza LLC ("Mid America"), Rising Dough, Inc. ("Rising Dough"), RJ Inc. ("RJ"), Galleons Inc. ("Galleons"), Try Our Pizza, Inc. ("Try Our Pizza"), and M&M Pizza ("M&M") – are Domino's franchisees.[3]  Each is owned (in whole or in part) and/or is

---

[2] Indeed, the parties do not argue otherwise, as evidenced by the pending cross-Motions for Summary Judgment, leading the Court to wonder why this case has devolved into a legal donnybrook punctuated by frequent name-calling and invective, and into which the parties, unfortunately, have repeatedly dragged the Court.

[3] The remaining two corporate Plaintiffs – J Triple T, Inc., and FBN, Inc. – are not proper plaintiffs and must be dismissed.  J Triple T is no longer a Domino's franchisee – its franchises were acquired by M&M in 1992.  (McCormick Opp. Aff. ¶ 6 ("In 1992, M&M acquired J Triple T and its three Domino's franchises.  In 2002, Domino's sent renewals for the three franchises owned by J Triple T to me in the names of M&M, and I signed those renewals under the name M&M on January 24, 2002.").)  Furthermore, Plaintiffs concede that FBN "is not a proper party to this lawsuit."  (Pl. Mem. in Opp'n at 4.)

controlled by the individual Plaintiffs:  Kevin Bores owns Blue Earth and is an officer of

Mid America, which own a total of 12 Domino's franchises in Minnesota and Missouri

(Bores Aff. ¶¶ 2-3); Jennifer Huber owns Rising Dough and co-owns RJ, which own a total

of 3 Domino's franchises in Maine (Huber Aff. ¶¶ 2-3); and Christopher McCormick is a

corporate officer of Galleons, Try Our Pizza, and M&M, which own several Domino's

franchises in Ohio (McCormick Aff. ¶¶ 2-3).

Under rules promulgated by the Federal Trade Commission, franchisors like

Domino's are required to disclose certain information to prospective franchisees.  See 16

C.F.R. § 436.1(a)(1).  Domino's has made its required disclosures by issuing Uniform

Franchise Offering Circulars ("UFOCs") from time to time.  See United States v. Bldg.

Inspector of Am., Inc., 894 F. Supp. 507, 510 (D. Mass. 1995) (noting that FTC has

approved use of UFOCs for disclosures required under 16 C.F.R. § 436.1(a)(1)).  Pursuant

to its UFOCs, Domino's represented to prospective franchisees (including the corporate

Plaintiffs here) that it "would provide [them] with standards for authorized food and

beverage preparation, storage and display equipment, motor vehicles, other equipment,

fixtures, furniture, signs and decorating for the Store."  (Korzenowski Aff. Ex. C at 26.)

Franchisees would be given the right to purchase these items "from any approved source."

(Id.)  However, Domino's stated that it would limit from whom potential franchisees could

purchase ingredients, supplies, and other materials used in the preparation, packaging, or

delivery of pizza and other food products, and advised potential franchisees that it

(Domino's) "may be the exclusive supplier" of those items.  (Id.)

3

When they became Domino's franchisees, each of the corporate Plaintiffs executed

Domino's' Standard Franchise Agreement, which incorporates many of the terms of the

UFOCs.  Of particular relevance here is Section 8.2 of the corporate Plaintiffs' franchise

agreements (the "Franchise Agreements"), which provides in pertinent part:

> We will provide you with *specifications* for pizza, other authorized food and beverage preparation, dispensing, storage and display equipment, delivery and related motor vehicles, other equipment, fixtures, furniture, *computer hardware and software*, exterior and interior signs and decorating required by the Store.  *You may purchase items meeting our specifications from any source.*

(Pineda Aff. Ex. 3 § 8.2 (emphases added).)[4]  Section 8.2, therefore, conforms to the

UFOCs with respect to the purchase of fixtures, furniture, store equipment (including

computers), and the like.  Similarly, Section 12.2 of the Franchise Agreements conforms

with the UFOCs with respect to the purchase of ingredients, packaging, food-distribution

items, and similar materials:

> All pizza and other food ingredients, beverage products, cooking materials, containers, packaging materials, other paper and plastic products, utensils, uniforms, menus, forms, cleaning and sanitation materials and other supplies and materials used in the operation of the Store must conform to the specifications and quality standards established by us from time to time. . . . We may in our sole discretion require that ingredients, supplies, and materials used in the preparation, packaging, and delivery of pizza and other authorized food products be purchased exclusively from us or from approved suppliers or distributors.

(Id. § 12.2.)

The heart of the present dispute concerns Domino's' PULSE, a "proprietary,

---

[4] There are minor differences in the text of Section 8.2 in each Franchise Agreement, but those differences are immaterial for present purposes.

comprehensive computer system created specifically for Domino's Pizza stores" that "allows better communication, service, . . . information gathering and reporting, and coordination" among Domino's' United States stores. (Def. Mem. at 3 & n.2.) Domino's created PULSE in the late 1990s and began installing it in its corporate stores in 2001. It has since advised all of its franchisees that they must purchase and install PULSE by June 30, 2008. PULSE hardware can only be purchased from IBM, while PULSE software can only be purchased from Domino's. (Korzenowski Aff. Ex. A at 41.)

According to Plaintiffs, the only reason Domino's has mandated PULSE is to generate additional revenue from its franchisees. (Pl. Mem. at 13.) For this and other reasons, they have refused to install PULSE. Instead, they insist that under Section 8.2 of their Franchise Agreements, Domino's must provide them with the "specifications" for PULSE. They further argue that they may purchase computer hardware and software meeting those specifications "from any source," and not merely from Domino's.

The parties' dispute over PULSE culminated in Plaintiffs filing the instant action. Plaintiffs allege six causes of action in their Amended Complaint: (1) breach of contract; (2) fraud; (3) negligent misrepresentation; (4) breach of the implied covenant of good faith and fair dealing; (5) violation of the Minnesota Franchise Act, Minn. Stat. § 80C.01 *et seq.*; and (6) promissory estoppel. Domino's has answered and interposed counterclaims for breach of contract and indemnification; it also seeks a declaration that it is permitted to require franchisees to purchase and install PULSE. After more than a year of protracted (and contentious) discovery, the parties have now cross-moved for summary judgment.

5

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  <u>Celotex</u>, 477 U.S. at 322; <u>Mems v. City of St. Paul, Dep't of Fire & Safety Servs.</u>, 224 F.3d 735, 738 (8th Cir. 2000).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  <u>Graves v. Ark. Dep't of Fin. & Admin.</u>, 229 F.3d 721, 723 (8th Cir. 2000); <u>Calvit v. Minneapolis Pub. Schs.</u>, 122 F.3d 1112, 1116 (8th Cir. 1997).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); <u>Krenik v. County of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

**I.      Who are the proper Plaintiffs?**

Before analyzing the merits of the parties' claims, the Court must address a preliminary issue.  As Domino's notes in its Motion papers, the individual Plaintiffs have not signed the Franchise Agreements; only the corporate Plaintiffs have done so.  For this reason, Domino's argues that the individual Plaintiffs lack standing to sue for breach of the Franchise Agreements.  (Def. Mem. at 22.)

6

In response, the individual Plaintiffs assert that they have standing because they have "executed personal guarantees for . . . their franchise companies' obligations to Domino's." (Pl. Mem. in Opp'n at 4.)[5]  This argument, however, misapprehends the nature of the breach-of-contract claim asserted in the Amended Complaint.  That claim alleges only a breach of the Franchise Agreements by Domino's, not a breach of the guarantees.  Accordingly, the individual Plaintiffs lack standing to sue for the alleged breach of the Franchise Agreements.  See Veerkamp v. Farmers Coop. Creamery of Foreston, 573 N.W.2d 715, 717 (Minn. Ct. App. 1998) ("Only a party to a contract may move to enforce it."); Grgic v. Cochran, 689 S.W.2d 687, 690 (Mo. Ct. App. 1985) (same); Mahalsky v. Salem Tool Co., 461 F.2d 581, 584 (6th Cir. 1972) (recognizing same under Ohio law); see also 13 Richard A. Lord, Williston on Contracts § 37:1 (4th ed. 2000) (noting general rule that "strangers to a contract have no rights under the contract").[6]  For the same reason, the

---

[5] The individual Plaintiffs also point to Domino's' most recent UFOC – in which Bores, Huber, and McCormick are listed as "Domino's Pizza Franchisees" – to support their standing to sue for breach of the Franchise Agreements.  (Pl. Mem. in Opp'n at 4.)  The mere fact that Domino's labels the individual Plaintiffs as franchisees, however, cannot transform them into parties to the Franchise Agreements.  See Upper Midwest Sales Co. v. Ecolab, Inc., 577 N.W.2d 236, 241 (Minn. Ct. App. 1998) ("Franchise status is [not] acquired by . . . the labels used by the parties.").

[6] This Court must apply Minnesota's choice-of-law rules to Plaintiffs' claims.  E.g., Schwan's Sales Enters., Inc. v. SIG Pack, Inc., 476 F.3d 594, 595-96 (8th Cir. 2007) (federal court sitting in diversity applies choice-of-law rules of forum state).  The Franchise Agreements contain identical choice-of-law clauses, requiring the application of the law of the state where the franchise is located to disputes arising thereunder.  Generally speaking, Minnesota courts recognize and apply choice-of-law clauses in contracts requiring the application of a foreign state's law.  See id. at 596 (citing Milliken & Co. v. Eagle Packaging Co., 295 N.W.2d 377, 380 n.1 (Minn. 1980)).  For this reason, the Court will apply the law of Minnesota, Missouri, Maine, and Ohio – where the corporate Plaintiffs' franchises are located – to their breach-of-contract claim.  In so doing, the Court notes that relevant law in each of these states is nearly identical.

individual Plaintiffs lack standing to assert claims for breach of the implied covenant of

good faith and faith dealing (Count IV) and promissory estoppel (Count VI), which are

merely derivative of the breach-of-contract claim.

Moreover, although not argued by Domino's, the Court concludes that this analysis

is equally applicable to Plaintiffs' remaining claims for fraud (Count II) and breach of the

Minnesota Franchise Act (Count V).[7]   In the former, Plaintiffs allege that they were

fraudulently induced to sign the Franchise Agreements.  (See infra at 20-21.)  Because only

the corporate Plaintiffs signed those Agreements, however, they are the only entities that

could have been "induced" to sign them.  As to the latter claims, only a "franchisee" may

seek relief under the Minnesota Franchise Act.  See Minn. Stat. § 80C.17, subd. 1.  Here,

only the corporate Plaintiffs are franchisees under the Act.  See Minn. Stat. § 80C.01, subd.

5.  Hence, only they may sue for violations of the Act.

Accordingly, the individual Plaintiffs lack standing and their claims must be

dismissed.[8]

## II.     The breach-of-contract claim

The Court next turns its analysis to the breach-of-contract claim, which is the crux

of this case.  Relying on five different sections of the Franchise Agreements, Domino's

---

[7] Plaintiffs also have alleged a claim for negligent misrepresentation, but that claim is duplicative
of the fraud claim and will be dismissed.  (See infra at 19-21.)

[8] The individual Plaintiffs appear to concede that they should be dismissed from this action.
(See Pl. Mem. at 40 n.12 (asserting that "there are no third-party claims at issue in this case" and that
"[t]his case involves only claims asserted *by the parties of the respective [Franchise Agreements]*")
(emphasis added).)

argues that it is clear that it may require its franchisees, including the corporate Plaintiffs,

to purchase and install PULSE in their stores.  (Def. Mem. at 13-18.)  The corporate

Plaintiffs, on the other hand, argue that Section 8.2 of the Franchise Agreements clearly

*prevents* Domino's from imposing such a "mandate," and that the other sections cited by

Domino's do not (and cannot) trump the express language of Section 8.2.  (Pl. Mem. at 20-

34.)  Interestingly, despite their diametrically opposed interpretations of the Franchise

Agreements, no party argues that the Agreements are ambiguous; rather, the corporate

Plaintiffs and Domino's argue that the language in the Franchise Agreements "clearly and

unambiguously" supports their proposed interpretations.[9]

The interpretation of an unambiguous contract is a matter of law for the Court.  E.g.,

Travertine Corp. v. Lexington-Silverwood, 683 N.W.2d 267, 271 (Minn. 2004); Hawkes v.

Commercial Union Ins. Co., 764 A.2d 258, 266-67 (Me. 2001); J.E. Hathman, Inc. v. Sigma

Alpha Epsilon Club, 491 S.W.2d 261, 264 (Mo. 1973); Saunders v. Mortensen, 801 N.E.2d

452, 454 (Ohio 2004).  When interpreting a contract, the Court's goal is to divine the

parties' intent.  Travertine, 683 N.W.2d at 271; Apgar v. Commercial Union Ins. Co., 683

A.2d 497, 500 (Me. 1996); J.E. Hathman, 491 S.W.2d at 264; Saunders, 801 N.E.2d at 454.

If a contract is unambiguous, the parties' intent is manifest from the terms of the contract

---

[9] The parties' competing interpretations of the Franchise Agreements do not render those
Agreements ambiguous *per se*.  See Connect Commc'ns Corp. v. Sw. Bell Tel., L.P., 467 F.3d 703,
714 (8th Cir. 2006) (Bye, J., dissenting) (noting that accepting such a proposition "would mean
ambiguity turns on the parties' arguments rather than a contract's terms, thereby rendering *every*
disputed contract ambiguous") (emphasis in original).

itself.  <u>Travertine</u>, 683 N.W.2d at 271; <u>Apgar</u>, 683 A.2d at 500-01; <u>J.E. Hathman</u>, 491

S.W.2d at 264; <u>Saunders</u>, 801 N.E.2d at 454.

Having reviewed the Franchise Agreements in their entirety, giving them a fair,

reasonable, and practical construction, <u>see, e.g.</u>, 13 Richard A. Lord, Williston on

Contracts §§ 32:1 – 32:5 (4th ed. 2000) (noting that, when construing a contract, court

must examine all parts of contract and give language therein a reasonable construction

using ordinary and plain meaning of contract's terms), the Court determines that the

Agreements are clear and unambiguous, and do not permit Domino's to mandate the

installation of PULSE by franchisees, unless Domino's provides the "specifications" for

PULSE and permits franchisees to obtain computer hardware and software meeting those

specifications "from any source."  In reaching that conclusion, Section 8.2 of the Franchise

Agreements is of paramount importance.

As noted above, Section 8.2 *expressly* states that Domino's will provide its

franchisees with "specifications" for "computer hardware and software," and *expressly*

gives franchisees the right to purchase computer hardware or software meeting those

specifications "from any source."  Clearly, then, Domino's cannot require its franchisees to

purchase computer equipment directly from it (or from any other source that Domino's

designates).  Yet, that is precisely what would occur if Domino's were allowed to foist the

PULSE system onto its franchisees, because PULSE is only available through IBM (for

hardware) and Domino's (for software).  Dominos' PULSE mandate, therefore, runs afoul

of Section 8.2.

10

Domino's interprets Section 8.2 differently and argues that it can mandate the installation of PULSE because Section 8.2 affords it the "right to determine what 'computer hardware and software' . . . will be used in Domino's stores." (Def. Mem. at 14.) This argument misses the mark. Section 8.2 merely allows Domino's to establish *specifications* for computer hardware and software to be used in Domino's stores. (Pineda Aff. Ex. 3 § 8.2 ("We will provide you with specifications for . . . computer hardware and software . . . .").) Domino's argues that PULSE itself is a "specification" (Def. Mem. at 16), but this argument lacks merit, for two reasons.

First, in the usual sense of the word, a "specification" is "a plan or proposal for something," such as "a written description . . . that embodies the manner and process of making, constructing, compounding, and using" an item. Webster's Third New International Dictionary 2187 (1986). More succinctly, a specification is a guide to constructing a finished product. Using this commonly understood definition, PULSE cannot be a "specification" because it is *already* a finished product; it is neither a plan nor a proposal, nor does it guide its users (the franchisees) through construction of a computer hardware and software system.[10]

---

[10] This same logic scuttles Domino's argument that PULSE is a "Standard" that franchisees are obligated to follow under Sections 15.1 and 15.4 of the Franchise Agreements. As Domino's itself acknowledges, a "Standard" under these Sections is a "minimum guideline." (Def. Mem. at 4 n.4; Devereaux Aff. ¶ 20.) That is consistent with the common meaning of the word "standard," which is synonymous with "criterion," "gauge," or "yardstick." Webster's Third New International Dictionary 2223 (1986). The PULSE system simply does not fit these definitions. Moreover, were Domino's permitted to simply deem PULSE a "specification" or a "Standard" in order to force franchisees to purchase it, then Domino's would be able to make an end-run around the express language of Section

Second, the language of Section 8.2 must be read to include an implicit obligation for Domino's to use computer hardware and software specifications that would render such items obtainable from multiple sources. Accordingly, PULSE cannot be a "specification," because it is impossible for franchisees to obtain it from more than one source. While Domino's asserted at oral argument that Section 8.2 does not require it to use specifications that would make computer hardware and software obtainable from multiple sources, the Court cannot agree. If Domino's utilized such specifications and, hence, left franchisees with only one source from which to obtain computer equipment, then the purpose of Section 8.2 – permitting franchisees to obtain computer equipment "from any source" – would be vitiated. The Court must avoid such a result when interpreting the Franchise Agreements. See Current Tech. Concepts, Inc. v. Irie Enters., Inc., 530 N.W.2d 539, 543 (Minn. 1995) ("A contract must be interpreted in a way that gives all of its provisions meaning."); SC Testing Tech., Inc. v. Dep't of Envtl. Prot., 688 A.2d 421, 424 (Me. 1996) (same); Ringstreet Northcrest, Inc. v. Bisanz, 890 S.W.2d 713, 718 (Mo. Ct. App. 1995) (same); Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth., 678 N.E.2d 519, 526 (Ohio 1997) (same). Simply put, in order to give the phrase "from any source" in Section 8.2 of the Franchise Agreements any meaning, Domino's must use specifications for computer hardware and software that render it possible to obtain such items from multiple sources.

---

8.2. The Court will not countenance such a result.

Domino's next cites Section 14.1 of the Franchise Agreements and argues that it can determine what "computer and point of sale system" will be used in its stores. (Def. Mem. at 14.) Section 14.1 states that franchisees must "agree to establish and retain a . . . computer and point of sale system . . . *conforming to the requirements prescribed by us*." (Pineda Aff. Ex. 3 § 14.1 (emphasis added).) When Section 14.1 is read together with Section 8.2, however, it becomes evident that the "requirements prescribed by" Domino's must be the "specifications" Domino's is obligated to provide to franchisees under Section 8.2. Looked at another way, Section 14.1 requires franchisees to install a computer system meeting certain requirements set by Domino's, but it does not (and cannot) mean that Domino's can limit where franchisees obtain the components of that system. Otherwise, Section 14.1 could not be harmonized with the express language in Section 8.2 permitting franchisees to purchase computer equipment "from any source" – such language would be rendered meaningless.

In addition, Domino's refers to Section 9 of the Franchise Agreements to argue that it can require franchisees to "refurbish" their stores, which may involve "the substitution or addition of new or improved equipment, including computer hardware and software." (Pineda Aff. Ex. 3 § 9.) There is little doubt that Domino's *can* require franchisees to update their computer equipment by providing new "Standards" or "specifications" for that equipment. What it *cannot* do, however, is be the sole vendor of the equipment or otherwise dictate where it can be obtained, as is true with PULSE.

The Court's conclusion that the PULSE mandate violates the Franchise Agreements

13

is buttressed by Section 12.2 of the Agreements.  As discussed above, that section states

that Domino's may require franchisees to purchase certain items – including "pizza and

other food ingredients, beverage products, cooking materials, containers, packaging

materials, other paper and plastic products, utensils, uniforms, menus, forms, cleaning and

sanitation materials and other supplies and materials used in the operation of the Store" –

directly from Domino's.  Section 12.2, however, makes no mention of computer hardware

or software.  Had Domino's truly intended to reserve the right to force franchisees to

purchase computer equipment only from Domino's, it could have easily included the phrase

"computer hardware and software" in Section 12.2 (as it did in Section 8.2).  The absence

of such language in Section 12.2 is telling and supports the corporate Plaintiffs' argument.

At oral argument, Domino's directed the Court's attention to its 2003 amendment to

its UFOC, which removed "computer hardware or software" from the list of items

franchisees may purchase "from any source."  The fact that Domino's amended its UFOC,

however, is irrelevant.  Rather, it is the terms of the Franchise Agreements that control the

outcome of the breach-of-contract claim, and those terms expressly grant the corporate

Plaintiffs the right to obtain computer equipment "from any source."  Domino's also noted

that the corporate Plaintiffs have signed nine Franchise Agreements since the UFOC was

amended in 2003, and argued that those "new" Agreements expressly permit Domino's to

mandate PULSE.  Specifically, Domino's pointed to the fact that the "new" Agreements

expressly incorporate an amended version of Domino's Operating Manual, which contains a

"Standard" mandating PULSE.  For the reasons set forth above, the Court rejects this

argument; Domino's cannot circumvent the clear and express language of Section 8.2

simply by deeming PULSE a "Standard" in the Operating Manual.  (See note 10, supra.)[11]

Perhaps recognizing that the express language of the Franchise Agreements does

not aid its cause, Domino's attempts to fall back on general propositions of franchise law

to support its case.  In particular, Domino's asserts that "[a] franchisor can require

franchisees to use uniform products and equipment in their operations. . . . The federal

Franchise Rule, in both its existing form and in the amended form announced January 22,

2007, indicates a single computer system can be mandated for use in the entire franchise

system."  (Def. Mem. at 15 n.8.)  But the fact that Domino's may have the *legal* right to

mandate a single computer system for all franchisees does not mean that it currently

possesses the *contractual* right to do so.  Put differently, even if Domino's can mandate a

universal computer system for its franchises under the FTC's Franchise Rule, it has agreed

not to do so under its current Franchise Agreements.[12]

At bottom, it cannot seriously be disputed that Domino's may change computer

systems or require franchisees to update those systems from time to time – that much is

_____

[11] Notably, Section 8.2 of the "new" Franchise Agreements does not differ from the Franchise Agreements executed prior to the 2003 UFOC amendments.  (See Bores Aff. Ex. A (2004 SFA executed by Blue Earth); McCormick Aff. Ex. A (2005 SFA executed by Galleons).)  Just as it did when it amended its UFOC in 2003, Domino's could have easily changed the language of Section 8.2 in the "new" Agreements to strip franchisees of the ability to obtain computer hardware and software from any source, but it did not do so.

[12] This conclusion, of course, relates only to the *current* Franchise Agreements.  The Court expresses no opinion as to whether Domino's may mandate the installation of PULSE in *future* franchise agreements.

abundantly clear from the Franchise Agreements.  Yet, it is equally clear that Domino's

cannot force its franchisees to purchase updated computer hardware or software *only from*

*Domino's* (or from another source of Domino's choosing).  Because PULSE can only be

purchased from Domino's (and IBM), Domino's cannot, consistent with the Franchise

Agreements, mandate the installation of that system by its franchisees.  Instead, if it insists

upon mandating PULSE, it must provide the franchisees with PULSE's specifications and

allow them to purchase computer equipment meeting those specifications "from any

source."  Insofar as Domino's refuses to do so, the Court determines that the corporate

Plaintiffs are entitled to summary judgment on their breach-of-contract claim.

　　　　This does not end the matter, however, because the precise nature of the judgment to

which the corporate Plaintiffs are entitled is unclear.  While they purport to seek

compensation for "damages" they have suffered as a result of the PULSE mandate (see Am.

Compl. ¶ 45), they have not explicated what those damages are.  Moreover, no such

"damages" are obvious to the Court, because the corporate Plaintiffs have yet to install

PULSE.  In actuality, what the corporate Plaintiffs seek is an order requiring Domino's to

provide them with "specifications" for the PULSE hardware and software, so that they may

acquire computer hardware and software meeting those specifications "from any source."

(See Pl. Mem. at 44.)  Although such relief was not requested in the Amended Complaint,

Domino's clearly understood that to be the relief the corporate Plaintiffs seek.  (See Def.

Mem. in Opp'n at 11 n.6 (arguing that Domino's should not be required to turn over

specifications for PULSE software).)  Accordingly, the Court concludes that the corporate

16

Plaintiffs are entitled to a declaration that, assuming Domino's persists in requiring them to install PULSE in their Domino's stores, Domino's must provide them with specifications for the PULSE hardware and software, and that they may acquire hardware and software meeting those specifications "from any source."  See Fed. R. Civ. P. 15(b) (noting that when an issue not raised in pleadings is tried by express or implied consent of parties, issue is treated as if it had been raised in pleadings).[13]

## III.   Several other claims rise or fall with the breach-of-contract claim

Having concluded that the corporate Plaintiffs are entitled to summary judgment on the breach-of-contract claim, several other claims can be easily resolved.  In particular, the corporate-Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing (Count IV) fails because there exists no separate cause of action for breach of the implied covenant when the claim arises from the same conduct as a breach-of-contract claim.  See

---

[13] Domino's complains that "[i]f Plaintiffs [are] allowed to take the source code for Domino's PULSE software and shop it to other software companies, not only would it violate Domino's intellectual property rights, it would expose the Domino's PULSE system to duplication and sale to other pizza delivery companies."  (Def. Mem. in Opp'n at 11 n.6.)  It is hard to understand how the corporate Plaintiffs would violate Domino's intellectual property rights, however, when Domino's is obligated, under the Franchise Agreements, to make PULSE's specifications available to its franchisees.  In any event, the corporate Plaintiffs conceded at oral argument that they are not seeking the source code to PULSE's software; they merely ask that Domino's specify what functions it requires that software to perform, so that they may obtain software performing those functions "from any source."  While Domino's asserted at oral argument that it would be "impossible" to provide those specifications without handing over the source code, that "impossibility," simply put, is not the corporate Plaintiffs' concern.

Of course, Domino's could opt to forego the PULSE mandate vis-a-vis the corporate Plaintiffs, thereby mitigating any concerns it has about turning over PULSE's specifications.  Domino's has nowhere indicated a willingness to do so, however.

17

Seren Innovations, Inc. v. Transcontinental Ins. Co., No. A05-917, 2006 WL 1390262, at

*8 (Minn. Ct. App. May 23, 2006) (citation omitted); Margolies v. McCleary, Inc., 447

F.3d 1115, 1125-26 (8th Cir. 2006) (applying Missouri law); Lakota Local Sch. Dist. Bd.

of Educ. v. Brickner, 671 N.E.2d 578, 583-84 (Ohio Ct. App. 1996).[14]  The same is true of

the corporate-Plaintiffs' promissory-estoppel claim (Count VI) – that claim and the breach-

of-contract claim are mutually exclusive.  See Grueling v. Wells Fargo Home Mortgage,

Inc., 690 N.W.2d 757, 761 (Minn. Ct. App. 2005); Cottle Enters., Inc. v. Town of

Farmington, 693 A.2d 330, 335 n.6 (Me. 1997); Chesus v. Watts, 967 S.W.2d 97, 106

(Mo. Ct. App. 1998); Kashif v. Cent. State Univ., 729 N.E.2d 787, 791 (Ohio Ct. App.

1999).  Indeed, for this reason, the corporate Plaintiffs have asserted their promissory-

estoppel claim in the alternative to their breach-of-contract claim.  (Pl. Mem. in Opp'n at

21-22.)  Finally, because the Court has ruled in the corporate Plaintiffs' favor on the

breach-of-contract claim, Domino's' counterclaims seeking a declaration that it can

mandate the installation of PULSE (Count I) and asserting that the corporate Plaintiffs have

breached the Franchise Agreements by failing to install PULSE (Count II) necessarily fail.[15]

---

[14] This claim fails under Maine law because, with limited exceptions not relevant here, Maine does not recognize the implied covenant of good faith and fair dealing in contracts.  See Black v. Black, 842 A.2d 1280, 1285 n.5 (Me. 2004).

[15] In Count II of its counterclaims, Domino's also asserts that the individual Plaintiffs breached their guarantees by "caus[ing] the franchisees they own to breach and/or repudiate their obligations under the franchise agreements by refusing to install and use the Domino's PULSE system."  (Answer to Am. Compl. and Counterclaims ¶ 22.)  Because the Court finds that the corporate Plaintiffs may refuse to install PULSE, these claims fail *ipso facto*.  Domino's also seeks attorneys' fees for pursuing this counterclaim, but it is not entitled to such fees because it did not prevail on the claim.  (See id. ¶ 23 (right to attorneys' fees accrues only when there has been a "judgment entered in [Domino's] favor").)

18

Accordingly, each of these claims will be dismissed.

## IV.    The remaining claims

### A.    The negligent-misrepresentation claim

In Count III of the Amended Complaint, the corporate Plaintiffs purport to assert a claim for "negligent" misrepresentation.  However, they allege that Domino's "misrepresentations" were knowingly (not negligently) made.  (See Am. Compl. ¶ 56 ("Domino's *knowingly* made false statements and omissions to each of the named Plaintiffs before Plaintiffs signed their Franchise Agreements") (emphasis added); id. ¶ 57 ("Domino's *knowingly* made false statements and omissions to each of the named Plaintiffs after Plaintiffs signed their Franchise Agreements") (emphasis added).)  In other words, the negligent-misrepresentation claim is, in actuality, a fraud claim.  See Florenzano v. Olson, 387 N.W.2d 168, 173 & n.2 (Minn. 1986) (noting that "[f]raud is distinguished from negligence by the element of scienter required" and that "fraudulent intent" means "*knowledge* of the untrue character of [the] representations") (emphasis added).[16]  Because the corporate Plaintiffs assert a fraud claim in Count II of their Amended Complaint – which repeats the allegations in the "negligent" misrepresentation claim verbatim – Count III is duplicative and will be dismissed.  See Artis v. Francis Howell N. Band Booster Ass'n,

---

[16] The corporate -Plaintiffs' tort claims are not governed by the choice-of-law clauses in the Franchise Agreements and, accordingly, those claims present a choice-of-law issue.  However, no party has addressed that issue; accordingly, Minnesota law applies.  See BBSerCo, Inc. v. Metrix Co., 324 F.3d 955, 960 n.3 (8th Cir. 2003) (law of forum state applies by default where parties do not raise choice-of-law issue).

Inc., 161 F.3d 1178, 1182 (8th Cir. 1998) (affirming dismissal of redundant claims under

42 U.S.C. § 1983); Guy Carpenter & Co. v. John B. Collins & Assocs., Inc., Civ. No. 05-

1623, 2006 WL 2502232, at *9 (D. Minn. Aug. 29, 2006) (Tunheim, J.) (dismissing as

duplicative unfair competition claim predicated on same facts as other tort claims); see

also Fed. R. Civ. P. 12(f) (court may strike "redundant" allegations from pleadings).

**B.     The fraud claim**

The fraud claim (Count II) alleges that Domino's knew, at the time the Franchise

Agreements were signed, that it intended to mandate PULSE and that Domino's' failure to

disclose this fact induced the corporate Plaintiffs to sign the Franchise Agreements.  (Am.

Compl. ¶¶ 46-54.)  In other words, the corporate Plaintiffs assert what is commonly known

as a "fraudulent-inducement" claim.

Under Minnesota law, a fraudulent-inducement plaintiff may elect to sue for

rescission of the contract it was fraudulently induced to sign or sue for damages.  E.g.,

Anders v. Dakota Land & Dev. Co., 289 N.W.2d 161, 163 (Minn. 1980).  Here, the

corporate Plaintiffs have elected to seek damages for Domino's allegedly fraudulent

conduct.  (Am. Compl. ¶ 53.)  The problem this creates is that the corporate Plaintiffs have

also asserted a claim for breach of contract.  While two such claims may co-exist, see

Brooks v. Doherty, Rumble & Butler, 481 N.W.2d 120, 128 (Minn. Ct. App. 1992), the

corporate Plaintiffs must demonstrate the existence of "separate damages for fraud and for

breach, lest the damage award be duplicative," id.  The corporate Plaintiffs have made no

effort to do so here; in fact, they have nowhere argued that they have yet suffered any

damages at all.  Moreover, to the extent the corporate Plaintiffs might suffer *future*

damages from the PULSE mandate, those damages would merely consist of the cost of

installing PULSE in their stores – precisely the same damages that would flow from

Domino's' breach of the Franchise Agreements by the PULSE mandate.  Accordingly, the

corporate Plaintiffs have failed to prove separate damages for the fraud claim and the

breach-of-contract claim, and the fraud claim will be dismissed.  See id.

### C.     The Minnesota-Franchise-Act claim

In Count V, the corporate Plaintiffs allege that Domino's violated the Minnesota

Franchise Act (the "Act") by failing to disclose that it intended to mandate PULSE before

the corporate Plaintiffs signed their Franchise Agreements.  Domino's argues that it is

entitled to summary judgment on this claim, for several reasons.

First, Domino's argues that only Blue Earth may assert a claim under the Act

because the Act protects only Minnesota franchisees.  (Def. Mem. at 29-31 (citing, *inter*

*alia*, Minn. Stat. § 80C.19, subd. 1).)  The corporate Plaintiffs concede that the Act applies

only to Blue Earth.  (Pl. Mem. in Opp'n at 16 n.8.)  Hence, the claim must be dismissed

insofar as it is asserted by the other corporate Plaintiffs.

Second, Domino's argues that Blue Earth has failed to show that Domino's made any

false or misleading statements in connection with the sale of Blue Earth's franchises.  (Def.

Mem. at 32-33.)  In response, Blue Earth argues that its claim hinges on *when* Domino's

decided to mandate PULSE; it asserts that, if Domino's made that decision prior to August

2003 (when Domino's first disclosed the PULSE mandate in the UFOC), its failure to

21

disclose the PULSE mandate earlier violated the Act.  (Pl. Mem. in Opp'n at 16-19.)  Blue

Earth, however, claims that it cannot, at this time, point to any evidence indicating when

Domino's made this decision because it needs discovery on the issue.  (Id. at 18-19.)  The

Court rejects Blue Earth's eleventh-hour assertion.

As discussed above, this case has been pending for more than 18 months.  The

parties engaged in discovery for more than a year before filing the instant cross-Motions.

There is simply no reason why Blue Earth could not have sought the evidence it now

purports to need during the year that it was taking discovery.  Indeed, it would have been

simple for Blue Earth to ask Domino's – either in an interrogatory, a Rule 30(b)(6)

deposition, or a request for admission – when it decided to mandate PULSE.  Blue Earth

cannot be heard to complain at this late stage that it needs additional discovery to answer

that simple question.  See Alexander v. Pathfinder, Inc., 189 F.3d 735, 744 (8th Cir. 1999)

(Rule 56(f) permits court to defer summary-judgment ruling "[i]f the opposing party *has a*

*good reason* for being unable to present facts essential to its response") (emphasis added);

10B Wright, Miller & Kane, Federal Practice & Procedure: Civil 3d § 2741 (1998)

("courts will not delay a case to allow discovery when the discovery sought could have been

instituted earlier").

Blue Earth argues that it could not obtain the necessary evidence because "[t]he

parties agreed to suspend discovery on all claims unrelated to the interpretation of the

express and unambiguous provisions of the" Franchise Agreements.  (Pl. Mem. in Opp'n at

18 n.9.)  The only such "agreement" about which the Court is aware, however, occurred in

late January 2007, when Magistrate Judge Mayeron issued a Second Amended Pretrial

Scheduling Order concerning then-remaining discovery (Doc. No. 178).[17]  In other words,

discovery had been ongoing for more than a year before the parties agreed to any discovery

limitations.  Moreover, prior to issuing the Second Amended Pretrial Scheduling Order,

Blue Earth (and Domino's) specifically advised the Court that "they have all the information

they need to bring and respond to cross-motions for summary judgment."  (Id. at 2.)

     In any event, the parties cannot use a self-imposed limitation on discovery to evade

this Court's Orders.  And, as the Court twice made clear in its scheduling Orders, *all*

discovery was required to be completed in advance of the instant Motions, not just

discovery relating to the interpretation of the Franchise Agreements.  (See 12/21/05

Scheduling Order (Doc. No. 16) at 1 ("*All fact discovery of any kind* shall be commenced

in time to be completed by [June 1, 2006].") (emphasis added); 4/25/2006 Scheduling

Order (Doc. No. 55) at 1 (amending deadline for "[a]ll fact discovery of any kind" to July 1,

2006).)[18]

     For these reasons, the Court denies Blue Earth's belated request for additional

discovery.  And, in the absence of any evidence indicating that Domino's decided to

mandate PULSE but delayed disclosing that mandate, the Court will grant Domino's'

---

[17] Notably, the parties' "agreed-to limitation" is nowhere mentioned in their joint Rule 26(f) Report to the Court (Doc. No. 11).

[18] In fact, if the parties had truly intended to limit discovery to the interpretation of the Franchise Agreements, then they would have cross-moved for *partial* summary judgment.  However, their cross-Motions are styled as Motions for Summary Judgment.

Motion on this claim.

### D.      Domino's' indemnification counterclaim

Finally, Domino's asserts in a counterclaim that the corporate Plaintiffs must

indemnify it for the expenses incurred defending the *individual*-Plaintiffs' claims.  In

support of that counterclaim, Domino's points to Section 22.3 of the Franchise

Agreements, which states in pertinent part:

> If we . . . become a party to any suit . . . brought by any person or persons
> (including your employee or prior employee) or any other person or entity by
> reason of any claimed act or omission by you, your employees or agents, or by
> reason of any act or omission occurring on the Store premises, or in your
> delivery service area, or while on the way to or from the delivery service area,
> by reason of an act or omission with respect to the business or operation of the
> Store, . . . you shall indemnify and hold us . . . harmless against all judgments,
> settlements, penalties, and expenses, including attorney's fees, court costs and
> other expenses of litigation . . . incurred by or imposed on us . . . in connection
> with the investigation or defense relating to such claim or litigation . . . .

(Pineda Aff. Ex. 3 § 22.3.)  The Court rejects Domino's' attempt to shoehorn its

indemnification claim into Section 22.3.

Domino's argues that the individual Plaintiffs are "other persons" under Section

22.3 and that their claims concern an "omission" in their stores – specifically, the "stated

unwillingness to purchase and use Domino's PULSE at the store[s]."  (Def. Mem. in Opp'n

at 15-16.)  The Court does not agree that the refusal to install PULSE constitutes an

"omission" by the corporate Plaintiffs.  Rather, that refusal arises out of an act *by*

*Domino's*:  the PULSE mandate.  Moreover, in the Court's view, the only reasonable and

practical construction of Section 22.3 is that franchisees must indemnify Domino's for

lawsuits arising out of acts or omissions committed by franchisees or by their employees, not for acts or omissions committed *by Domino's*.  To conclude otherwise would mean that Domino's could foist unlawful policies onto its franchisees but be immune from suits challenging those policies, an "absurd" result.  (Pl. Mem. at 41.)[19]

In addition, as discussed in more detail above, the individual-Plaintiffs' claims must be dismissed because they are not proper parties to this action.  (See supra at 7-9.) Accordingly, there are no "judgments, settlements, [or] penalties" related to those claims for which Domino's is entitled to indemnification.

Finally, Domino's cannot persuasively argue that it has incurred legal fees specifically defending the individual-Plaintiffs' claims.  There is nothing unique about those (now dismissed) claims that distinguishes them from the corporate-Plaintiffs' claims.  Indeed, all claims in the Amended Complaint are simply asserted by "Plaintiffs." Hence, any attorneys' fees incurred by Domino's defending the individual-Plaintiffs' claims necessarily would have been incurred defending the corporate-Plaintiffs' claims (for which Domino's is not entitled to indemnification under Section 22.3).

Accordingly, the Court will dismiss Domino's' indemnification counterclaim.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

---

[19] For example, Domino's could require its franchisees to engage in unlawful discrimination in employment decisions, yet under Domino's construction of Section 22.3, it would be entitled to indemnification in a challenge to that policy brought by a discriminated-against employee.

**ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. No. 214) and

Defendant's Motion for Summary Judgment (Doc. No. 209) are each **GRANTED IN**

**PART** and **DENIED IN PART** as follows:

1.   To the extent that Count I of the Amended Complaint is asserted by the

individual Plaintiffs, FBN, Inc., and J Triple T, Inc., Plaintiffs' Motion is

**DENIED**, Defendant's Motion is **GRANTED**, and Count I is **DISMISSED**

**WITH PREJUDICE**;

2.   To the extent that Count I of the Amended Complaint is asserted by the

remaining Plaintiffs, Plaintiffs' Motion is **GRANTED** and Defendant's

Motion is **DENIED.**  It is further **DECLARED** that, should Domino's persist

in requiring these Plaintiffs to install PULSE in their Domino's stores,

Domino's must provide them with specifications for the PULSE hardware

and software, and Domino's must permit them to purchase computer

hardware and software meeting those specifications from any source;[20]

3.   With respect to Counts II through VI of the Amended Complaint, Plaintiffs'

Motion is **DENIED**, Defendant's Motion is **GRANTED**, and Counts II

through VI are **DISMISSED WITH PREJUDICE**; and

4.   With respects to Counts I through III of Defendant's Counterclaims,

Plaintiffs' Motion is **GRANTED**, Defendant's Motion is **DENIED**, and

---

[20] (See note 13, supra.)

Counts I through III of Defendant's Counterclaims are **DISMISSED WITH**

**PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**[21]

Dated: May   23  , 2007                                    s/Richard H. Kyle
                                                          RICHARD H. KYLE
                                                          United States District Judge

---

[21] The Court retains jurisdiction over Plaintiffs for purposes of Domino's' pending Motion for Sanctions (Doc. No. 197).